IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**RHONDA A. WOLFE,**                                                    1:14-CV-00560-AC

        Plaintiff,                                OPINION AND ORDER

v.

**CAROLYN W. COLVIN,**
Commissioner, Social Security
Administration,

        Defendant.


**ACOSTA, Magistrate Judge:**

    Plaintiff Rhonda Wolfe seeks judicial review of a final decision of the Commissioner of the

Social Security Administration (SSA) in which she denied Plaintiff's applications for Supplemental

Security Income (SSI) under Title XVI and for Disability Insurance Benefits (DIB) under Title II

of the Social Security Act. This court has jurisdiction to review the Commissioner's final decision

pursuant to 42 U.S.C. § 405(g).

    Following a review of the record, the court finds the decision of the Commissioner is

1- OPINION AND ORDER

supported by substantial evidence in the record and the ALJ's decision is affirmed.

### Administrative History

Plaintiff filed her applications for DIB and SSI on February 25, 2010, and alleged a disability onset date of February 16, 2009, due to "diabetes gastritis cataracts narrowing in the neck anxiety panic attack PTSD vertigo, high blood pressure, cholesterol." Tr. 186-201.[1] The applications were denied initially and on reconsideration. An Administrative Law Judge (ALJ) held a hearing on July 9, 2012. Tr. 42-88. At the hearing Plaintiff was represented by an attorney. Plaintiff, a lay witness, and a vocational expert (VE) testified.

The ALJ issued a decision on August 6, 2012, in which he found Plaintiff was not disabled. Tr. 57-66. That decision became the final decision of the Commissioner on January 31, 2014, when the Appeals Council denied Plaintiff's request for review. Tr. 1-5.

On April 4, 2014, Plaintiff filed a complaint in this court seeking review of the Commissioner's decision.

### Background

Plaintiff was born in April, 1962, and was 50 years old at the time of the hearing. Tr. 89. She completed the ninth grade. Tr. 192.

### Standards

The initial burden of proof rests on the claimant to establish disability. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). To meet this burden, a claimant must demonstrate her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental

---

[1] Citations to the official transcript of record filed by the Commissioner on September 24, 2014, are referred to as "Tr."

impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ must develop the record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011)(quoting *Mayes v. Massanari,* 276 F.3d 453, 459–60 (9th Cir. 2001)).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). *See also Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161 (9th Cir. 2012). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Molina*, 674 F.3d. at 1110-11 (quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009)). It is more than a mere scintilla [of evidence] but less than a preponderance. *Id.* (citing *Valentine*, 574 F.3d at 690).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Ludwig v. Astrue*, 681 F.3d 1047, 1051 (9th Cir. 2012). The court may not substitute its judgment for that of the Commissioner. *Widmark v. Barnhart*, 454 F.3d 1063, 1070 (9th Cir. 2006).

*Disability Evaluation*

At Step One the claimant is not disabled if the Commissioner determines the claimant is

engaged in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(I). *See also Keyser v. Comm'r of Soc. Sec.*, 648 F.3d 721, 724 (9th Cir. 2011).

At Step Two the claimant is not disabled if the Commissioner determines the claimant does not have any medically severe impairment or combination of impairments. 20 C.F.R. § 416.920(a)(4)(ii). *See also Keyser*, 648 F.3d at 724.

At Step Three the claimant is disabled if the Commissioner determines the claimant's impairments meet or equal one of the listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii). *See also Keyser*, 648 F.3d at 724. The criteria for the listed impairments, known as Listings, are enumerated in 20 C.F.R. part 404, subpart P, appendix 1 (Listed Impairments).

If the Commissioner proceeds beyond Step Three, she must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained, work-related physical and mental activities the claimant can still do on a regular and continuing basis despite his limitations. 20 C.F.R. § 416.920(e). *See also* Social Security Ruling (SSR) 96-8p. "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule." SSR 96-8p, at *1. In other words, the Social Security Act does not require complete incapacity to be disabled. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234-35 (9th Cir. 2011)(citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

At Step Four the claimant is not disabled if the Commissioner determines the claimant retains the RFC to perform work she has done in the past. 20 C.F.R. § 416.920(a)(4)(iv). *See also Keyser*, 648 F.3d at 724.

If the Commissioner reaches Step Five, she must determine whether the claimant is able to

do any other work that exists in the national economy. 20 C.F.R. § 416.920(a)(4)(v). *See also Keyser*, 648 F.3d at 724-25. Here the burden shifts to the Commissioner to show a significant number of jobs exist in the national economy that the claimant can perform. *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010). The Commissioner may satisfy this burden through the testimony of a VE or by reference to the Medical-Vocational Guidelines set forth in the regulations at 20 C.F.R. part 404, subpart P, appendix 2. If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 416.920(g)(1).

### *ALJ's Findings*

At Step One the ALJ found Plaintiff has not engaged in substantial gainful activity since her February 16, 2009, alleged onset date. Tr. 19.

At Step Two the ALJ found Plaintiff has severe impairments of diabetes mellitus, obesity, tachycardia, and lumbar strain. *Id.*

At Step Three the ALJ determined Plaintiff's impairments did not equal in severity a listed impairment, and found Plaintiff retained the RFC to perform less than a full range of light work. The ALJ found Plaintiff can lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently. She can stand/walk for six hours in an eight hour workday, and she can sit for six hours in an eight hour workday. The ALJ found Plaintiff can occasionally stoop, kneel, crawl, balance, climb and crouch. She should avoid exposure to vibration, moving machinery, and unprotected heights. Tr. 22-23.

At Step Four, the ALJ found Plaintiff retained the ability to perform her past relevant work as a cashier II. Tr. 26.

At Step Five, the ALJ found Plaintiff was capable of performing other work, including stuffer, marking clerk, and rug cleaner. *Id.*

5- OPINION AND ORDER

*Medical Evidence and Testimony*

I.  The Medical Record

On December 2, 2007, Plaintiff was seen in the emergency room for chest pain.  Tr. 735.  She reported she had a heart attack in June, but the record indicates "[o]n my review of chart, this is actually an indeterminate troponin elevation followed by a negative isotope scan."  *Id.*  On March 12, 2008, Plaintiff was seen in the emergency room for back pain.  Tr. 728.  On April 15 Plaintiff was seen in the emergency room for pancreatitis.  Tr. 720.  She was advised to follow a bland non-fat diet.  On April 24 Plaintiff was seen in the emergency room for abdominal pain.  Tr. 695.  On May 8, 2008, Plaintiff was seen in the emergency room for foot pain with a fractured toe.  Tr. 688.  On May 28 Plaintiff was seen in the emergency room for back pain.  Tr. 673.  On August 8, 2008, Plaintiff called an ambulance after experiencing chest pain.  Tr. 433.  On September 8 Plaintiff was seen in the emergency room for chest pain.  Tr. 646.  She stated she had had a heart attack in June 2007.  *Id.*  An EKG was normal.  Tr. 650.  Plaintiff was seen in the emergency room on September 26 for neck spasms, and on October 17 for migraine.  Tr. 636.

On November 20 Plaintiff was seen in the emergency room for neck pain following a motor vehicle accident.  Tr. 631.  On November 21, 2008, Plaintiff returned to the emergency room with increased neck pain. Tr. 618.  CT scans of the cervical spine and brain were negative.  Tr. 623.  On December 23 Plaintiff was seen in the emergency room for abdominal pain and pancreatitis was diagnosed.  Tr. 609.  Imaging studies of the lumbar spine on December 24 showed minor osteophytes without other abnormalities.  Tr. 603.  On December 26, 2008, Plaintiff was seen in the emergency room for abdominal pain.  Tr. 592.  On December 29 Plaintiff returned to the emergency room for left upper quadrant pain.  Tr. 577.  She admitted she did not follow dietary recommendations.  On

January 8, 2009, Plaintiff was seen in the emergency room for left upper quadrant pain radiating to the left flank. Tr. 563.

Plaintiff established care with Karin Kuhl, M.D., on January 30, 2009. Tr. 417. Plaintiff reported acute pancreatitis the prior April and December, and denied back pain. Tr. 418. She denied depression and anxiety. On February 9, 2009, Plaintiff reported shoulder and abdominal pain. Tr. 413. Dr. Kuhl noted her left shoulder and lower back pain with normal strength and no numbness and that Plaintiff "injured it while moving friend yesterday." *Id.* On February 12 Plaintiff was seen in the emergency room with tachycardia. Tr. 548. On February 16, her alleged onset date of disability, Plaintiff reported depression and loss of appetite. Tr. 405. She had chronic neck and knee pain for which she took ibuprofen and an occasional vicodin. Dr. Kuhl prescribed Wellbutrin.

On February 29, 2009, Katherine Greene, Psy.D., conducted a psychodiagnostic evaluation of Plaintiff. Tr. 279-83. Plaintiff said she abused methamphetamine from age 23 for about 15 years, and has been sober since July 2003. Her mood and affect were depressed and anxious. Tr. 281. She reported depression about once a week that can last all day. She is irritable and moody and gets anxious in public. She fears stairs, heights, and close spaces, and if she is inside with too many people "she hyperventilates, starts bawling and runs outside to calm down." *Id.* Plaintiff was bullied in school and quit talking from age 15 to 18. She is vigilant and does not trust other people.

Dr. Greene administered the Symptom Assessment Questionnaire, the Personality Assessment Screener (PAS), and the Beck Depression Inventory. On the PAS Plaintiff received a score of 31, "reflecting an overall marked level of emotional problems." *Id.* She was in the marked range for Negative Affect, Health Problems, and Social Withdrawl. Plaintiff's symptom assessment reflected elevated levels of somatization, phobic anxiety, and anxiety. Tr. 282. The Beck

Depression Inventory reflected a moderate level of depression. Dr. Greene recommended psychotherapy, and her diagnostic impression was Social Anxiety Disorder, Adjustment Disorder with Mixed Emotions, PTSD, and methamphetamine abuse in full remission. She assessed a GAF of 61. Tr. 283.

On March 2, 2009, Dr. Kuhl advised Plaintiff to continue ibuprofen for knee pain and noted no depression or anxiety. Tr. 402. On March 6 an imaging report on both knees showed minimal scattered degenerative changes and ossification of the medial collateral ligament of the left knee. Tr. 398. On March 18 Plaintiff was seen in the emergency room for abdominal pain. Tr. 534. Imaging studies of the abdomen were normal. Tr. 544. On March 27 Dr. Kuhl noted continued neck and knee pain since a November 20, 2008 motor vehicle accident. Tr. 388. Plaintiff denied depression or anxiety, and her diabetes was poorly controlled. Dr. Kuhl encouraged her to walk daily.

In April 2009 Plaintiff complained of neck pain and knee pain, as well as numbness in her left hand fingers. Tr. 383. She denied depression and anxiety. Dr. Kuhn reviewed imaging studies from Plaintiff's November 2008 emergency room visits and noted that unenhanced CT of the head was normal, unenhanced CT of the cervical spine showed no fracture, there was no evidence of canal or foraminal stenosis, soft tissues appeared normal, and there was mild dextroscoliosis of the lumbar spine. Tr. 386. Dr. Kuhl diagnosed cervical strain and prescribed aspirin. In May 2009, Dr. Kuhl noted physical therapy was helping with neck pain, and knee pain had resolved. Tr. 379. She denied depression and anxiety. Tr. 381. On May 22 Plaintiff was seen in the emergency room for vertigo and nausea. Tr. 528. On May 27 Plaintiff was seen in the emergency room for a left foot injury after dropping a gallon of ice cream on it. Tr. 523.

8- OPINION AND ORDER

On June 2, 2009, Plaintiff denied depression and anxiety, and was noncompliant with her blood pressure medication. Tr. 377. On June 19 Plaintiff was eating poorly and denied depression or anxiety. Tr. 373. On July 24 Plaintiff had vertigo arising from an ear infection. Tr. 364. She denied depression or anxiety. Tr. 366.

On August 18, Plaintiff saw Dr. Kuhl for allergies. Tr. 360. She had spent a week camping on the coast, and was not eating correctly for her diabetes.

Plaintiff saw Dr. Kuhl on September 18, 2009, with cold symptoms lasting two weeks. Tr. 356. Her diabetes was not well controlled. Plaintiff was seen in the emergency room on September 19 for chest pain. Tr. 491. An abdominal ultrasound was normal. *Id.*

On September 29, 2009, Plaintiff reported she was very anxious "and stressed out all of the time." Tr. 351. Her glucose was not well controlled, and Plaintiff admitted she was not eating appropriately.

On October 6, 2009, Plaintiff complained of anxiety and neck pain. Tr. 346. Dr. Kuhl noted "counseling may really help, but she declines for now." *Id.*

In November 2009, Plaintiff told a physician she had not used methamphetamine for four years. Tr. 327.

In December 2009, Plaintiff said her gastritis resolved with pepcid. Tr. 318.

On January 4, 2010, Plaintiff reported muscle spasms in her neck. Dr. Kuhl advised her to walk briskly for 20 minutes daily. Tr. 317. On January 18 Dr. Kuhl noted Plaintiff was taking valium and Norco 2-3 times per week. Tr. 311. On February 2 Plaintiff was seen in the emergency room with uncontrolled diabetes. Tr. 488.

On February 16, 2010, Plaintiff reported right lower quadrant pain. Tr. 302. She thought she

9- OPINION AND ORDER

had pulled a muscle.  Hyperlipidemia was much improved on statins, though "compliance is an issue at times."  Tr. 305.  On March 15 Plaintiff was taking valium sparingly, and taking Norco occasionally for back and knee pain.  Tr. 298.  On March 20 Plaintiff went to the emergency room with a migraine but left without being seen.  Tr. 485.

On April 2, 2010, Plaintiff was seen in the emergency room after a fall with pain in her jaw.  Tr. 478.  Xrays were normal.  Tr. 483.

On April 12, 2010, Plaintiff reported migraine headaches about once a week which last 2-3 days.  She was depressed but denied counseling and medication.  Tr. 295.  Plaintiff was given a wrist splint for carpal tunnel syndrome.

On May 17, 2010, Dr. Kuhl noted Plaintiff's blood pressure went up when she went to the grocery store.  Tr. 290.  She had no headaches or chest pain.  Plaintiff stopped taking her blood pressure and cholesterol medications because she thought those issues had been addressed.

Plaintiff was seen in the emergency room on June 1, 2010, for chest wall pain.  Tr. 472.

On June 22, 2010, Plaintiff saw Dr. Kuhl for shoulder pain much improved with daily exercises.  Tr. 286.  Her neck was sore "off and on" but better since working less.  Blood sugar was under control.  Plaintiff took valium a couple of times per week for anxiety.  She had no depression, anxiety or agitation.  Tr. 288.  She declined an SSRI or counseling.

Plaintiff was seen in the emergency room on July 14, 2010, after falling at work.  She had an avulsion fracture of the left medial maleolus and an xray of the left knee showed chronic dystrophic calcification along the MCL consistent with remote injury, but no acute fracture, dislocation, or joint effusion.  Tr. 461, 464.

Plaintiff was seen in the emergency room on August 10 and 23, 2010, for reasons that are not

clear. Tr. 459-60.  On December 4, 2010, Plaintiff was seen in the emergency room for diarrhea and mild gastroenteritis. Tr. 450.  On December 26, 2010, Plaintiff was seen in the emergency room for a knee and ankle sprain.  Tr. 442.  On that occasion she reported last using methamphetamine in 2002.  Tr. 443.  An x-ray of the knee showed chronic post traumatic change in the medial tibial plateau unchanged from prior studies.  Tr. 446.

On January 11, 2011, Dr. Kuhn examined Plaintiff's left leg and ankle and referred her to physical therapy, and noted that her gastric symptoms were much improved with a reduced coffee intake. Tr. 1036.  Plaintiff requested referral to an orthopedist for her left leg and ankle.  Tr. 1034.

On April 7, 2011, Dr. Kuhl noted knee pain though she was able to walk and bear weight. Tr. 1118.  Plaintiff was not compliant with medications, and took 1-2 valium daily for anxiety.

On April 20, 2011, Plaintiff was discharged from physical therapy.  Tr. 1024.  She attended her initial evaluation of left leg and ankle sprain, and was scheduled for seven more appointments, but cancelled three and did not show for another and was therefore discharged.

On June 10 Plaintiff was seen in the emergency room for abdominal pain and was advised to reduce her caffeine intake of ten cups of coffee a day.  Tr. 991, 994.  On August 9 Dr. Kuhn reported Plaintiff was not taking her blood pressure or cholesterol medications, and had not needed valium lately.  Tr. 1100.

On August 20 Plaintiff was seen in the emergency room with unstable angina.  Tr. 903.  An angiogram of the pulmonary arteries was negative for pulmonary embolic disease or acute thoracic abnormality to explain chest pain.  Tr. 1160.

On October 1, 2011, Plaintiff was seen in the emergency room for tachycardia.  On October 25, 2011, Dr. Kuhl noted Plaintiff was not medically compliant and did not take her cholesterol and

11- OPINION AND ORDER

blood pressure medications as prescribed. Tr. 1080. On December 1 Plaintiff had an atrial ablation. Tr. 1170.

On March 27, 2012, Michael F. O'Connell, Ph.D., conducted a psychodiagnostic interview. Tr. 1187-97. Dr. O'Connell reviewed some medical records. Plaintiff reported drinking 20-24 cups of coffee per day. Tr. 1191. Her affect was depressed and tearful. Dr. O'Connell diagnosed Dysthymic Disorder; Caffeine-Induced Anxiety Disorder v. Panic Disorder with Agoraphobia; Amphetamine Dependence, reported in sustained full remission; Polysubstance Abuse, reported in sustained full remission; and rule out Somatoform Disorder NOS. Tr. 1193. Dr. O'Connell concluded Plaintiff had mild impairment of the ability to interact appropriately with the public. Tr. 1196.

On June 22, 2012, Plaintiff was seen in the emergency room for tachycardia. Tr. 1199.

II. Testimony at July 9, 2012 Hearing

Sandy Bergman testified that Plaintiff has worked for her for about five years. Tr. 49. Plaintiff worked three days a week, nine hours a day, for a time, but "it's just too much for her." Tr. 51. Ms. Bergman testified that Plaintiff was working two days a week, and could work a third day in an emergency, but if she works three days a week for two or three weeks Plaintiff gets sick. When Plaintiff gets sick her voice gets hoarse, she has optical migraines, her blood pressure goes up, she has heart issues, and she gets colds. Ms. Bergman testified that she believed Plaintiff was legitimately sick, and that Plaintiff was a dependable, honest employee on a part-time schedule. Tr. 52. Plaintiff had worked the two-day-a-week schedule for about six months to a year. Tr. 54.

Plaintiff testified she had worked two days a week since about 2009. When she worked more than two days a week she got sick with anxiety attacks and depression. Tr. 57. She said "I just, I

12- OPINION AND ORDER

can't do it. I don't want to get out of my house. I don't want to go nowhere, don't even want to go to work. I get sick really super easy. People come in and they'll have a bug and I'll get it, and then I'm sick for weeks at a time, and so two days a week is all I can do." *Id.*

Plaintiff testified that she works as a cashier, and it is stressful because people come in drunk and she has to refuse to sell them alcohol and this causes her anxiety. Some customers are abusive. Plaintiff testified that if she did not work with the public she "would probably stress out making sure that I got everything done exactly right, which I would be getting sick." Tr. 60. She has been fired because of illness.

Plaintiff has medication for anxiety, but she does not take it often. *Id.* It causes drowsiness. She was diagnosed with PTSD in 2002, and violent men trigger her symptoms. Tr. 62. She has had tachycardia and a cardio ablation in 2011. Tr. 62. The tachycardia returned two weeks prior to the hearing.

Plaintiff has neck spasms, lower back pain, left knee and ankle problems, and her hands swell and go numb. Tr. 63. She can stand for a maximum of ninety minutes. Tr. 64. She cannot sit for more than an hour because of her back, and most of the time when she is home she lies down. *Id.* Plaintiff testified she can walk about a block, and she can go up stairs but when she gets to the top "my hip has either gone out, my ankle's either started hurting or I can't breathe." Tr. 65.

Plaintiff testified she has pain in her left knee because "apparently I broke it years ago. Didn't know." *Id.* One doctor told her she should have surgery. She has to be very careful when bending from the waist or she will pull a muscle. She has had vertigo since 2009. Tr. 66.

Plaintiff stated she has problems with her hands. She can do something for about an hour and then she loses the strength in her hands. After work her hands swell and in the morning she has

no feeling in them.  When she is at work she can take breaks when she needs to.  Tr. 73.

Plaintiff testified she becomes anxious "in most circumstances" when asked to do something for an extended period of time.  Tr. 74.  She has not sought mental health treatment. When she tries to work three days a week she "started having panic attacks to the point that I started crying before I had to go to work."  Tr. 78.  She is an insulin dependent diabetic.

The VE testified that an individual with Plaintiff's RFC could perform work as a stuffer or rug cleaner.  Tr. 83.

*Discussion*

Plaintiff contends the ALJ erred by (1) failing to credit lay testimony; (2) finding Plaintiff less than fully credible; and (3) improperly weighing the medical evidence.

I.  Lay Witness Testimony

The ALJ has a duty to consider lay witness testimony.   20 C.F.R.  §  404.1513(d); 404.1545(a)(3); 416.945(a)(3); 416.913(d); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition.  *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993).  The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting her testimony.  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).  However, inconsistency with the medical evidence may constitute a germane reason.  *Lewis*, 236 F.3d at 512.  The ALJ may also reject lay testimony predicated upon the testimony of a claimant properly found not credible.  *Valentine v. Astrue*, 574 F.3d 685, 694 (9th Cir. 2009).

The ALJ noted Ms. Bergman's testimony, as set out above, and gave it little weight as unsupported by the medical evidence.  Tr. 25-26.  Ms. Bergman testified that if Plaintiff worked

more than 18 hours per week Plaintiff would get a hoarse voice, optical migraines, elevated blood pressure, heart issues, and colds. Tr. 52.

There is no evidence in the medical record of a hoarse voice. There is evidence that Plaintiff had a migraine on October 17, 2008, March 20, 2010, and April 12, 2010. Tr. 636, 485, 295. The medical record does not support Ms. Bergman's assertion that Plaintiff had migraines with any frequency either before or after she limited her work to 18 hours per week.

The record does show periods of poorly controlled hypertension. However, the record also shows Plaintiff was not always medically compliant regarding her blood pressure medication. Tr. 377, 290, 1118, 1100, 1080.

There is evidence of treatment for chest pain and tachycardia. Plaintiff complained of chest pain on December 2, 2007 (normal chest xray and normal EKG), September 8, 2008 (normal chest xray and normal EKG, negative cardiac enzymes), February 12, 2009 (tachycardia), September 19, 2009 (diagnosis atypical chest pain, noncardiac), June 1, 2010 (chest wall pain), August 20, 2011 (negative angiogram of pulmonary arteries), October 1, 2011 (tachycardia), and June 22, 2012 (tachycardia). Tr. 735, 646, 548, 491, 472, 1199. There is no significant evidence that working more than 18 hours per week caused Plaintiff to have cardiac issues.

The ALJ properly found Ms. Bergman's testimony not supported by the medical evidence and his treatment of that testimony is supported by substantial evidence.

II.  Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir. 1995). *See also Vasquez v. Astrue,* 547 F.3d 1101, 1104 (9th Cir. 2008). The ALJ's findings, however, must be

15- OPINION AND ORDER

supported by specific, cogent reasons. *Reddick v. Chater,* 157 F.3d 715, 722 (9th Cir. 1998). *See also Holohan v. Massanari,* 246 F.3d 1195, 1202 (9th Cir. 2001). Unless there is affirmative evidence that shows the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.* The ALJ must identify the testimony that is not credible and the evidence that undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Id.* at 724. *See also Holohan,* 246 F.3d at 1208. General findings (*e.g.,* "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick,* 157 F.3d at 722. *See also Holohan,* 246 F.3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir. 1996).

> Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an under-lying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell,* 947 F.2d at 344 (quoting 42 U.S.C. § 423(d)(5)(A) (1988)); *Cotton,* 799 F.2d at 1407-08. The *Cotton* test imposes only two requirements on the claimant:(l) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom.

*Smolen,* 80 F.3d at 1282. *See also Carmickle v. Comm'r Soc. Sec. Admin.,* 533 F.3d 1155, 1160 (9th Cir. 2008).

16- OPINION AND ORDER

The ALJ found Plaintiff's statements as to the severity of her impairments less than fully credible. Tr. 25. The ALJ cited Plaintiff's daily activities as inconsistent with her alleged limitations. "Her statements concerning her impairments and their impact on her ability to work are considerably more limited and restricted than is established by the medical evidence. Despite alleging continuing disability, no persuasive medical statement from a treating source has been submitted to substantiate her claim for benefits." *Id.* The ALJ noted Plaintiff performed household chores, drove, and worked. The ALJ cited the lay witness statement submitted by Plaintiff's mother, Bonnie Holland, who reported Plaintiff prepared meals, fishes, visits friends, and talks on the phone. Tr. 26. The ALJ cited Plaintiff's report to Dr. O'Connell that she could concentrate satisfactorily at work, her pace was average, and she had no problem with persistence. Tr. 25, 1193. The ALJ noted Plaintiff's periodic noncompliance with medication and treatment, and inconsistencies in Plaintiff's reports of drug use. Part-time work after an alleged onset date undermines credibility. *Bray v. Comm'r Soc. Sec. Admin.,* 554 F.3d 1219, 1227 (9th Cir. 2009).

The ALJ articulated clear and convincing reasons to find Plaintiff's symptom testimony less than fully credible. The ALJ's credibility determination is supported by substantial evidence.

III.  The Medical Evidence

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007). In such circumstances the ALJ should also give greater

17- OPINION AND ORDER

weight to the opinion of an examining physician over that of a reviewing physician. *Id.* If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart,* 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn,* 495 F.3d at 632; *Widmark,* 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark,* 454 F.3d at 1066 n.2. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

Plaintiff contends the ALJ erred in assessing Plaintiff's lumbar strain and by stating that "imaging of her back was never conducted." Tr. 24; Plaintiff's Brief at 24. Plaintiff is correct in that the ALJ erred by stating imaging studies were not conducted. However, the November 2011 imaging studies showed only mild dextroscoliosis of the lumbar spine. Tr. 386. Plaintiff contends the ALJ failed to consider lumbar degenerative changes in her posterior facets of her lower back, citing Ex. 7F/108. That exhibit is an analysis of a CT scan of Plaintiff's abdomen and pelvis, in which the radiologist notes "There is minimal degenerative change seen of the posterior facets of the lower lumbar spine." Tr. 545. Finally, Plaintiff cites December 2008 imaging studies of the lumbar spine which showed "minor anterior osteophytes are present at L3 and L4." Tr. 603.

Plaintiff concedes that the ALJ found lumbar strain to be a severe impairment, and argues that the ALJ failed to consider the role of lumbar strain in evaluating the combined effect of Plaintiff's impairments. Plaintiff does not point to any medical evidence of physical limitations

arising from lumbar strain that are not accommodated by the RFC.

Plaintiff contends the ALJ erred by relying on the opinions of the non-examining record reviewing physicians. Plaintiff does not point to any evidence that these opinions conflict with any other medical opinion.

The ALJ's consideration of the medical evidence is supported by substantial evidence.

IV. Duty to Develop the Record

Plaintiff contends the ALJ erred by failing to order a psychological examination. Plaintiff's counsel requested an examination in July 2011. Tr. 221.

The ALJ has an independent "'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Smolen,* 80 F.3d at 1288 (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)). This duty extends to the represented as well as to the unrepresented claimant. *Id.* The ALJ's duty to develop the record fully is heightened where the claimant may be mentally ill and thus unable to protect her own interests. *Higbee v. Sullivan,* 974 F.2d 558, 562 (9th Cir. 1992). Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to "conduct an appropriate inquiry." *Smolen,* 80 F.3d at 1288; *Armstrong v. Commissioner of Soc. Sec. Admin.,* 160 F.3d 587, 590 (9th Cir. 1998).

Plaintiff contends that Dr. O'Connell's assessment of rule-out somatoform disorder and reference to the benefit a medical evaluation may provide in determining the degree to which her somatic complaints related to organic dysfunction triggered the ALJ's duty to develop the record further. Plaintiff argues that Dr. O'Connell's opinion establishes an ambiguity requiring a medical opinion before it can be determined whether Plaintiff is disabled.. Plaintiff contends the ALJ erred

19- OPINION AND ORDER

by relying on the agency's reviewing physicians June 2010 opinions rendered before Dr. O'Connell's examination. However, the ALJ also referred multiple times to Dr. Kuhn's records and reports and emergency room reports through November 2011. Tr. 23-25. The record is not ambiguous and the ALJ did not err by failing to order another medical opinion.

### Conclusion

For these reasons, the decision of the Commissioner is affirmed and this matter is dismissed.

IT IS SO ORDERED.

Dated this _____18th_____ day of May, 2015.

JOHN V. ACOSTA
United States Magistrate Judge